**UNITED STATES of America, Appellee,**

v.

**Domenic IACIOFANO, Defendant, Appellant.**

**No. 83–1081.**

United States Court of Appeals, First Circuit.

Argued April 5, 1984.

Decided May 17, 1984.

Mark L. Nestor, Waltham, Mass., by appointment of the Court, for defendant, appellant.

Bruce A. Singal, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and BONSAL,* Senior District Judge.

* Of the Southern District of New York, sitting by designation.

88

BONSAL, Senior District Judge.

Defendant Domenic Iaciofano was convicted on December 2, 1982 of nine counts of mail fraud (18 U.S.C. § 1341) and five counts of wire fraud (18 U.S.C. § 1343). He was acquitted on one count of mail fraud. On January 19, 1983 he was sentenced by Judge Garrity to imprisonment for a period of four years. On January 24, 1983 he filed a Notice of Appeal and, on the same date, filed a motion for appointment of counsel for the purposes of his appeal. On February 9, 1983 defendant's present counsel on appeal was appointed, and he filed a notice of appearance on behalf of the defendant. This court extended the time for defendant to file briefs and record appendix to and including January 20, 1984.

The charges on which defendant was convicted arose from the business he conducted under the name of American Gold and Silver Exchange ("AGS")[1] in Dedham, Massachusetts from August 1979 to January 1980. During this period AGS sold "fixed-maturity contracts" in gold, silver and crude oil to investors throughout the country who paid between $2,000 and $7,000 per contract. The investor obtained the right to "control" a certain quantity of gold, silver or oil for a six-month period at a price set on the date of the contract. The price set was the market price of the commodity on the date the investor entered into the contract and was referred to as the "strike price." At the end of the six-month contract period, the investor had the option to: (1) take delivery of the full amount of the commodity controlled under the contract by paying the strike price times the number of ounces or gallons of each commodity, or (2) have the company resell the commodity and pay him the profit if the price was higher than the strike price, in which case the company would pay the amount of the increase over the strike price multiplied by the number of ounces, or gallons, of the commodity purchased.

It was brought out at the trial that during the period August 1979—January 1980 AGS sold 111 contracts to 83 investors throughout the country, receiving approximately $445,000. Between August 22 and November 2, 1979 AGS had arrangements with a company in New York called Euro-Swiss to secure its obligations to its investors, and paid Euro-Swiss various sums for this purpose. On or about November 2, 1979 AGS discontinued the arrangements with Euro-Swiss (it appearing that Euro-Swiss went into bankruptcy). AGS continued to sell contracts, and between November 2, 1979 and January 18, 1980 AGS sold 38 contracts and received $150,000 for them without making any arrangements to secure the commodity or money which might become due to the investor. During the period August 1979—January 1980 the prices of these commodities rose substantially. However, the investors were not paid any part of the money that was due to them. When the investors attempted to contact AGS at its previous phone number, they would get a recording which indicated that the number had been discontinued. Letters were returned "Addressee Unknown."

On January 16, 1980 a Cease and Desist Order was served on AGS by the Massachusetts State Securities Division. Defendant closed the Dedham office and moved to a branch office that AGS had been operating in Miami, Florida, the name of which was changed to "Kingston Precious Metals Associates."

The government brought out at the trial that numerous misrepresentations were made to investors, both in printed sales materials and over the phone, in order to induce them to buy contracts. The misrepresentations were designed to make AGS appear to be a big-time, reputable and successful company, when in fact it was not.

Among other representations made by the defendant's salesmen were that AGS did business at 120 Wall Street; that it had enjoyed unprecedented growth; and that it had an inter-office network of news and wire-communication systems and a research department. All of these state-

1. Defendant also used the name American Ex-     change, Inc.

ments were untrue. Prospective investors were told that if they purchased contracts they could sell them at any time within the six-month period, but investors who had purchased contracts were told they could not sell them until the end of the six-month period. The evidence further brought out that defendant created AGS and alone controlled it and its funds; that he received $91,000 from AGS; and that AGS paid his personal expenses, such as payments on a Cadillac he drove, utility bills, and the like.

In this appeal, defendant makes several contentions:

■ The defendant first contends that the district court erred in denying his motion for a continuance which he claimed to be entitled to because of the belated receipt of Jencks and *Brady* material from the government.

There was a colloquy on November 16, 1982 in which defense counsel stated that he had received the Jencks Act material on the afternoon of November 9 but that he had not had sufficient time to complete his study of it. However, defense counsel conceded that he had the names and addresses of the *"Brady"* people but had not had time to determine which ones would be most helpful to the defendant. The district judge denied the motion stating "I don't think it is necessary to a fair trial to have every statement of every witness not only indicated by Jencks Act material but also by his having been interviewed in advance of his testimony." Defendant also contends that the shortness of the time to examine these materials was a denial of the effective assistance of counsel at his trial.

■ We find nothing in the record to support the defendant's contentions. The record shows that defendant had the benefit of a vigorous defense. In our view, ineffective assistance of counsel will not be presumed on the basis of shortness of preparation time. *Rastrom v. Robbins,* 440 F.2d 1251, 1254 (1st Cir.), *cert. denied,* 404 U.S. 863, 92 S.Ct. 53, 30 L.Ed.2d 107 (1971). A review of the transcript satisfies us that defendant was effectively assisted by counsel throughout his trial.

■ The defendant next contends that he is entitled to a new trial because he was not provided with all the requested *Brady* material within the government's possession.

A review of the transcript does not indicate any *Brady* violation here. Defendant was furnished with all the records the government had of defendant's operations in Dedham. He was also furnished with all of the records of Euro-Swiss in the possession of the United States Attorney for the Southern District of New York. The former president of Euro-Swiss, who testified for the defense, stated that all the Euro-Swiss records, "over a quarter million documents ... (and) ... computer runs ... would fill a quarter of this room." However, the witness continued that he could tell from the records provided by the government that defendant had a complete set of all Euro-Swiss confirmations of purchase with respect to contracts made by AGS and that the last transaction between AGS and Euro-Swiss occurred on November 2, 1979. While the available Euro-Swiss records confirmed the government's contention that after November 2, 1979 defendant's contracts between AGS and its investors were not backed at all, there is no showing that the government failed to turn over any material which might have been exculpatory to defendant.

■ Defendant contends that the district court erred in not allowing a defense witness to testify regarding defendant's instructions to a salesman at his Miami office after the government was allowed to introduce testimony regarding the Miami office. There is nothing to show that this was prejudicial to the defendant, and it was a matter clearly within the discretion of the trial judge. *Harris v. United States,* 367 F.2d 633, 636 (1st Cir.1966), *cert. denied,* 386 U.S. 915, 87 S.Ct. 862, 17 L.Ed.2d 787 (1967).

Defendant next contends that his motion for judgment of acquittal with respect to

Counts 1, 4, 5, 10 and 15 of the indictment was improperly denied, contending that the government did not produce any testimony at the trial regarding these counts.

■ It is true that the government did not call the actual investors who were alleged in these five counts to have been defrauded. However, the government proved that mailings had been forwarded to these five investors, that money had been forwarded by each of them to the defendant or AGS, and that confirmation of their orders had been forwarded by AGS to the investors. Therefore, the proof on these counts conformed to the government's charge that defendant was engaged in a general scheme to defraud and that the mailings were made pursuant to that scheme. The government's proof, when considered "in the light most favorable to the government," was sufficient to permit the jury to find fraud with respect to these counts as part of a general scheme to defraud. *United States v. Pappas*, 611 F.2d 399, 403 (1st Cir.1979).

Defendant also contends that the court below erred in refusing to charge the jury as proposed in defendant's requests Nos. 4, 6, 12, 14, 23, 26, 27, 28 and 30.

■ After the district judge delivered his charge to the jury, defense counsel asked the court to additionally charge the jury as proposed in defendant's requests Nos. 2, 4, 6, 12, 14, 23, 26, 27, 28 and 30. The judge did additionally charge request No. 2, which pertained to accomplice testimony, and supplemented his charge on the credibility of witnesses. He did not charge the remaining requests. Defendant contends that the judge's failure to include the additional requests in his charge constitutes reversible error.

The record reveals that the district judge's original charge contained the substance of defense counsel's requested instructions Nos. 4, 6, 12 and 14. The district judge properly excluded requests Nos. 23, 26, 27, 28 and 30 as they misstated the law applicable to mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

We find no merit in the defendant's remaining contentions: that the judge should have recused himself after reading the sentencing memorandum; that defendant's voice on the tape was not properly authenticated; or that his four-year sentence was unduly harsh.

*Affirmed.*